Eric H. Gibbs (SBN 178658)
ehg@girardgibbs.com
Matthew B. George (SBN 239322)
mbg@girardgibbs.com
Caitlyn D. Finley (SBN 286242)
cdf@girardgibbs.com
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

*Plaintiffs' Interim Lead Class Counsel*

[Additional Plaintiffs' Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| *In re Adobe Systems Inc. Privacy Litigation* | Lead Case No. 5:13-cv-05226-LHK |
| | [Consolidated with Case Nos. 13-cv-05596-LHK, 13-cv-05611-LHK, 13-cv-05930-LHK, 14-cv-00014-LHK, 14-cv-00030-LHK, and 14-cv-00157-LHK] |
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| | DEMAND FOR JURY TRIAL |

1    Plaintiffs Christian Duke, Joseph Kar, Christina Halpain, Jacob McHenry, Anne McGlynn, and

2 Marcel Page, on behalf of themselves and all others similarly situated ("Plaintiffs"), allege against

3 defendant Adobe Systems, Inc. ("Adobe") as follows:

4 **NATURE OF THE CASE**

5    1.    Adobe is a software manufacturer whose software is installed on hundreds of millions of

6 computers around the world.  It maintains active debit and credit card data for millions of customers, it

7 offers a cloud-based subscriber service that continually updates software on its customers' computers

8 and stores their files, and it provides web development software that other companies rely upon to

9 collect and secure their customer's data.

10    2.    Sometime in mid-July 2013, hackers infiltrated Adobe's servers and spent several

11 weeks—without detection—rummaging through Adobe's network.  By August, the hackers had reached

12 Adobe's customer databases and source code repository, where they spent days or weeks removing

13 customer data and source code from Adobe's network—again, without detection by Adobe or its

14 security personnel.  Adobe apparently did not even realize its security had been compromised until two

15 independent Internet security researchers discovered Adobe's source code on a server used by cyber-

16 criminals and publicized their findings.

17    3.    Although Adobe publicly claims to provide industry-leading security practices—practices

18 that consumers reasonably expect—it turns out that Adobe does not use even the sort of industry

19 standard security measures that would have detected and stopped this most recent breach.  This is the

20 *eighth* time in the last six years that Adobe's security has been breached and marks the largest breach of

21 Adobe's system in terms of numbers of customers affected.  The high-profile nature of this particular

22 breach exposed just how poor of a job Adobe has done securing its customers' data.  Now that Adobe's

23 source code has been compromised, the threat to users' data has only intensified.  Hackers have already

24 exploited vulnerabilities in Adobe's ColdFusion source code to infiltrate several large companies'

25 websites.  Plaintiffs have filed this lawsuit to address Adobe's substandard security standards and

26 provide a remedy for three classes of people affected by Adobe's conduct.

27    4.    On behalf of a proposed California Data Breach Class, Plaintiffs seek an injunction

28 requiring Adobe to comply with California's statutory requirement that businesses implement and

1

maintain reasonable security procedures to protect California residents' personal information from unauthorized access.

5.     On behalf of a proposed Contract Class, Plaintiffs seek a declaratory judgment that sets forth Adobe's security obligations under its contracts.  These contracts permit Adobe to access its customers' computers, software, and data subject to a Privacy Policy that represents Adobe will do so using reasonable security measures.  Adjudication of Adobe's responsibilities under these contracts will help address Adobe's most recent security breach, as users who suffer identity theft or other specific monetary damage as a result of the breach will not have to individually re-litigate the technical issue of Adobe's security obligations.  Plaintiffs also seek injunctive relief on behalf of the Contract Class that will also ensure that Adobe implements appropriate procedures to alleviate the risk to class members of future security breaches.

6.     On behalf of a proposed Restitution Class, Plaintiffs seek an award of restitution to purchasers of Adobe's ColdFusion products and Creative Cloud subscription service.  Adobe's security is important to all its users, but particularly to those who purchased Adobe's ColdFusion products, which are used to design secure website applications, or Adobe's Creative Cloud service, which offers frequent updates to Adobe products and a place to store and share files through "the cloud."  Adobe was able to build the market for ColdFusion and the Creative Cloud only by withholding material information about Adobe's security practices, and it should now be required to offer these customers restitution that would return them (as near as possible) to the position they were in prior to investing time and money into these security-dependent products.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual class members exceed the sum value of $5,000,000, exclusive of interest and costs, and this is a class action in which more than two-thirds of the proposed plaintiff class, on the one hand, and Defendant Adobe, on the other, are citizens of different states.

8.     This Court has jurisdiction over Adobe because it maintains its principal headquarters in California, is registered to conduct business in California, has sufficient minimum contacts in California,

1  or otherwise intentionally avails itself of the markets within California, through the promotion, sale,

2  marketing and distribution of its products in California, to render the exercise of jurisdiction by this

3  Court proper and necessary.  Moreover, Adobe's wrongful conduct (as described below) emanates from

4  California.

5      9.      Venue is proper in this District under 28 U.S.C. § 1391 because Adobe resides in this

6  District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this

7  District.

8                                          **PARTIES**

9      10.     Plaintiff Christian Duke is a citizen and resident of San Diego, California.

10     11.     Plaintiff Joseph Kar is a citizen and resident of Los Angeles, California.

11     12.     Plaintiff Christina Halpain is citizen and resident of Huntington Beach, California.

12     13.     Plaintiff Jacob McHenry is a citizen and resident of Scranton, Pennsylvania.

13     14.     Plaintiff Anne McGlynn is a citizen and resident of Oakland, California.

14     15.     Plaintiff Marcel Page is a citizen and resident of Chicago, Illinois.

15     16.     Defendant Adobe Systems, Inc. is a corporation organized under the laws of the State of

16  Delaware with its principal place of business in San Jose, California.

17                                **FACTUAL ALLEGATIONS**

18                        **Background on Adobe and Adobe Products**

19     17.     Adobe is a multinational computer software company that sells and licenses printing,

20  publishing, multimedia, and graphics software products to consumers, professionals, publishers,

21  developers, businesses and organizations.

22     18.     Some of Adobe's most popular software products and services include Illustrator,

23  Photoshop, Acrobat Reader, InDesign, Dreamweaver, Muse, ColdFusion, and Creative Suite, a software

24  bundle that includes some of Adobe's most popular graphic design software applications. Adobe's

25  ubiquitous Acrobat Reader and Flash Player are commonly used by consumers on their computers or

26  smart phones to view documents, videos or other graphic Internet content.

27     19.     Many of Adobe's products and services sell for hundreds of dollars for software

28  upgrades, and up to several thousand dollars for initial licenses for products like Adobe ColdFusion (a

3

software product used by web developers to build dynamic web sites and Internet applications) or Adobe Photoshop (a digital imaging software used by photographers, graphic artists, designers, web professionals, video professionals and others).  Adobe sells its products and services through licensing or subscription agreements.  Both processes require consumers to register their purchases with Adobe— a process that requires users to give personal information to Adobe in order to purchase, as described below.

    a. <u>Licensed-Based Products:</u> Certain Adobe software products, such as its Digital Publishing Suite, are sold solely pursuant to licenses, meaning consumers purchase licenses, and pay a specified licensing fee, in order to use the product.  Typically, each purchased product license is registered to a single purchaser/user.  Prior to being able to use the product, the user must register the product with Adobe, using the product's uniquely assigned serial number.  This requires the user to create an account with Adobe and provide personal information such as an address, email address, log-in identification, password and the like.  The information Adobe collects is not necessarily needed for the customer to use the software.  The user may purchase upgrades or additions to the licensed product.  This service requires the user to provide his or her credit or debit card and billing information to Adobe, however, in order to complete the purchase online or via the Internet.

    b. <u>Subscription-Based Plans:</u> Adobe also sells software subscriptions for certain software products and services through its "Creative Cloud."  These software subscriptions rely on recurring monthly payments that require customers to keep an active credit card on file with Adobe.  Adobe stores credit and debit card and billing information so it can automatically charge customers without sending a traditional bill and without having to wait for payment.  Subscription terms can be "Month-to-Month" or for a "12-Month" period. "Month-to-Month" subscribers are automatically billed a monthly subscription fee "plus applicable tax" to their credit card on file with Adobe.  The plan renews automatically each month unless the user cancels.  Under the "12-Month" plan subscribers are billed, to their credit card on file with Adobe, a monthly fee "plus applicable tax."  Thus, irrespective of its term or duration, each subscription plan requires a user to provide an active credit card to Adobe and to complete a "sign-up process" which establishes an account with Adobe that requires the user to

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:13-cv-05226-LHK

provide to Adobe his or her credit or debit card account number, billing information and other personal information.

20.     Adobe's "Creative Cloud" service was introduced in April 2012, and by September 2013 more than a million users had subscribed to the cloud-based service.  The subscription price for Creative Cloud varies depending on the number of users, whether the user(s) have access to only one Adobe application or multiple Adobe applications, and the length of the commitment.  For example, access for one user to all Creative Cloud applications costs $49.99 per month with a one-year commitment and $74.99 per month with no commitment; access for one user to a single Creative Cloud application costs $19.99 with an annual commitment; and access for a team of users to all Creative Cloud applications costs $69.99 per user per month with a one-year commitment.

**Adobe's Collection of Millions of Consumers' Personally Identifiable Information**

21.     Adobe's software products have become industry standards.  One of Adobe's best known products, Adobe Reader, is the worldwide default standard for transmitting, opening and viewing scanned or PDF documents.  A decade ago, in 2002, Adobe reported that 250 million users use the product.  Adobe's Flash Player also is used by millions to view videos or other graphic content, including to access web sites that use Flash Player.

22.     Adobe knows that its products enjoy worldwide popularity, and that the company and its systems are prime targets for hackers and malware.  Adobe boasts on its website that it is a "big data" company, managing 27 petabytes[1] of data for millions of individual customers, which include "industry leaders such as Sony, U.S. Bank, and Caesar's Entertainment" – customers whose data Adobe knows would be desirable to thieves.

23.     Adobe similarly is aware that its Creative Cloud subscription service presents additional security risk for users.  These subscriptions require users to provide Adobe with, and to continually update, credit or debit card and related billing information stored with Adobe.   This is precisely the type of information that hackers or identity thieves look for, seek access to, trade, sell and profit from.  Hackers able to obtain this information may either sell it or use their own software development skills to

---

[1] 1 petabyte is equal to 1 million gigabytes of data.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:13-cv-05226-LHK

create access windows, commonly known as "exploits," which in turn can be traded or sold to others for substantial sums on the black market.

**The Design of Adobe's Products and Services Makes Them Vulnerable to Hackers**

24.     Adobe's products and services are attractive targets and vulnerable to hackers because of the way they are written and designed.

25.     Adobe's software products create a uniquely deep level of interaction with the host-based system which is beyond that of a traditional desktop application.  Once installed, Adobe's software programs reach out, interact regularly with, and embed themselves in the user's other applications and suites.

26.     This deeply integrated relationship increases the probability of infection, as well as the risk of a data breach by hackers.  As a result of this design, when a malicious document is transmitted to a user's computer and opened or executed within an Adobe program or scanned by the host operating system, an intruder can gain access to the other unrelated programs and files on the user's computer-- such as email, banking accounts and stored files—exposing those unrelated programs and files to intrusion, theft or harm.  By comparison, "sandboxed" software—software with limited access to external resources—exists as a control measure to protect against these same threats.

27.     Adobe's products and services also are designed to regularly and automatically connect to the Internet and to report back to Adobe user and usage information the company collects via that connection without notice to the user.  Subscription-based users, including the million plus that use Creative Cloud, must regularly connect to the Internet in this fashion or their subscription will cease to function.

28.     This feature of regular Internet connection and frequent "reporting back" of user and usage information to Adobe provides a mechanism for third-parties to capture or intrude upon the communication, making the Adobe product and service user vulnerable to malware, theft, or other intrusion.  Users of Adobe's products and services cannot take steps to reduce their risk of exposure.

**Adobe Promises to Use Industry-Leading Security Practices**

29.     Adobe offers use of its software products subject to End-User License Agreements (EULAs), and use of its website and services—including Creative Cloud—subject to its General Terms of Use.

30.     Adobe's General Terms of Use provide that class members' relationship with Adobe is governed by California law, and its EULAs similarly provide that Adobe's agreements with class members are governed by California law.

31.     Under Adobe's General Terms of Use and the EULAs, customers agree that Adobe may access their computers and use their data only in accordance with Adobe's Privacy Policy, which is incorporated into Adobe's contracts by reference.

32.     Adobe's Privacy Policy acknowledges that "the security of your personal information is important" and provides that Adobe will use "reasonable administrative, technical, and physical security controls" to protect consumers personal information.  Adobe's Safe Harbor Privacy Policy, which supplements Adobe's Privacy Policy, further provides that "Adobe Systems Incorporated uses reasonable physical, electronic, and administrative safeguards to protect your personal information from loss; misuse; or unauthorized access, disclosure, alteration, or destruction."  Adobe's Privacy Policy is made available to the public on Adobe's website along with the EULAs, General Terms of Use, and Safe Harbor Privacy Policy and were all in effect prior to the September 2013 breach.

33.     In addition to the terms of the Privacy Policy, Adobe has several webpages dedicated to explaining and describing Adobe's purportedly industry-leading security practices to consumers. According to Adobe's website:

> "At Adobe, the security of your digital experiences is our priority.  From our rigorous internal software development process and tools to our cross-functional incident response team, we strive to be proactive, nimble, and accurate in all aspects of security. ***What's more, our collaborative work with partners, researchers, and other industry organizations helps ensure the latest security best practices are built into every product and service we offer***."

(Emphasis added).

34.     Throughout its website, Adobe consistently and uniformly represents to consumers that Adobe employs "best" practices and works with industry leaders when it comes to data security:

7

Adobe believes it can achieve the ***best security*** through ongoing proactive measures and deployment of multiple in defense-in-depth methods.  ***We take pride in the company-wide best practices, processes and tools that help ensure your information is safe whenever you use Adobe products and services*** [. . .]

Adobe is proud of our work with partners, researchers, and other industry-leading companies and security organizations to share ideas for building more secure software, useful global threat data, and ***operational best practices***. We believe this collaboration results in better security for both our customers and others in the computing community.

(Emphasis added).

35.     Adobe's website also touts that members of Adobe Secure Software Engineering Team (or "ASSET") actively participate in several cyber-security industry organizations.

36.     When Adobe launched its Creative Cloud services, Adobe acknowledged one of consumers' principal concerns when subscribing to cloud-based services is security.  Adobe reassured consumers and businesses that Adobe uses industry-leading security practices.   According to Adobe, security, privacy and compliance policies are some of the most common questions Adobe receives about Creative Cloud.  In an informational document for IT Security Staff, Adobe stated that "Organizations using Creative Cloud are concerned about the safety of their data and that access to their data is reliable."

37.     On a Frequently Asked Questions (FAQ) page for Adobe's Creative Cloud service on its website, Adobe repeatedly emphasizes Adobe's use of industry-leading security practices:

**"How secure is the storage space on Creative Cloud?**
Adobe uses ***industry-leading security engineering processes*** to build its products. With Creative Cloud, security is considered at every level, from applications to networks to physical facilities.  In addition to the latest technologies, ***Adobe adheres to the latest best-practice policies regarding online security.***

**What security is used at the application level? What security measures are in place during file transfer, and are stored filed encrypted?**
***Creative cloud uses industry-leading encryption technology to protect our members' data*** […] For stored Creative Cloud assets, users benefit from ***industry-leading security*** and certifications provided by Amazon Web Services."

(Emphasis added).

8

38.     Several other of Adobe's FAQs and marketing materials also emphasize that Adobe works with industry researchers and organizations to "understand the latest security best practices and trends and continue to build security into the products and services we offer."

39.     Adobe further represents on its website that all Adobe products are subject to the Adobe Secure Product Lifecycle (SPLC), which "is a rigorous set of more than 80 software development best practices, processes, and tools designed to help keep your information safe when you use Adobe products and services."

40.     These types of promises create duties on behalf of Adobe to secure its source code and its customers' personal information and data in accordance with the same (or greater) standards promised with the latest security best practices and trends and require Adobe to continue to build security into the products and services it offers.  In addition to its contractual duties, Adobe owed a legal duty to Plaintiffs and the other class members to maintain reasonable and adequate security measures to secure, protect, and safeguard its source code and customers' personal information, and to sell software that is secure and that cannot be used to infect other software and their customers' computers.

41.     And, despite any attempts to do so, Adobe cannot disclaim or limit its liability for its security breaches and violations of law because any such purported terms or waivers in policies, contracts or EULAs are contrary to well established public policy are unenforceable under California law.

### Adobe's Abysmal Security Record

42.     Despite Adobe's many claims and representations about its use of industry-best practices, Adobe has consistently struggled with security problems for the past decade and has been an easy target for cyber criminals.

43.     Adobe's security problems are not limited to the most recent security breach, or even limited to just one or two additional incidents.  In six years Adobe has had at least *eight* different security breaches impacting its networks and software:

        a)  In 2007, an Adobe Reader bug allowed hackers access to all the files on people's computers.

b) In 2008, more than 1,000 hacked websites infected computers by delivering fake Adobe Flash Player updates that posed as CNN news notifications.

c) In 2009, a vulnerability in Adobe's Reader let hackers open back doors into people's computers.

d) In 2010, attackers created malicious Adobe PDF attachments to hack into several companies, including Adobe.

e) In 2011, yet another bug gave hackers remote access to people's computers – this time in Adobe's commonly used Flash Player.

f) In 2012, hackers gained access to Adobe's security system by tapping into its internal servers.

g) In early February 2013, Adobe issued an emergency update to its Flash Player for two previously unknown security holes that were being exploited by hackers. Less than a month later, Adobe was forced to issue another security patch for its vulnerable Flash Player plug-in.

h) In June 2013, less than 24 hours after Adobe's Creative Cloud went live, the software was hacked, causing versions of the Creative Cloud to appear on pirating websites.

44. Adobe's security practices were so bad that in 2010, former Apple CEO Steve Jobs singled out Adobe's commonly used Flash Player Plug-In for being "the number one reason Macs crash" and cited Flash Player for having "one of the worst security records in 2009."

45. In 2009, Adobe's Flash Player and Acrobat Reader tied for second place on Symantec's annual list of vulnerable plug-in programs. In 2010, Adobe's Acrobat Reader took the top spot on that list. In 2012, Flash Player won that dubious distinction.

46. A number of third-parties also have identified security vulnerabilities in Adobe's products and services. Two leading industry computer security organizations--US-CERT (the United States Computer and Emergency Readiness Team) and CVE (Common Vulnerability and Exposures list, which is co-sponsored by the Department of Homeland Security)—have issued bulletins and CVEs identifying known vulnerabilities in a number of Adobe's software products. To give just one example, on May 13, 2009, CVE issued CVE No. TA09-133B, identifying specific Adobe Acrobat, Reader, and

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:13-cv-05226-LHK

JavaScript vulnerabilities. This CVE bulletin alerted Adobe security personnel that the company's Adobe Reader and Acrobat Pro software—two of Adobe's most popular products—were susceptible to JavaScript vulnerabilities that allow remote attackers to run arbitrary and malicious code within systems utilizing these products.

47. Brian Krebs, one of the security researchers who discovered the Data Breach, stated that "Adobe did not put enough effort into securing its users' information." Numerous others have confirmed that the breach occurred "because Adobe did not follow best practices for password storage."

46. Adobe also has acknowledged the vulnerability of its products and services. In May 2013, for example, Adobe's Product Security Incident Response Team (PSIRT) issued its own security bulletin in which it confirmed information presented by outside CVE's identifying vulnerabilities in Adobe's Acrobat Reader product. In that bulletin, Adobe rated the Reader product a "Priority 1," meaning the software's vulnerabilities were either currently being targeted or had a high chance of being targeted by hackers.

**The Data Breach and Adobe's Failure to Reasonably Notify Consumers of the Breach**

47. According to Adobe, sometime in mid-August 2013, hackers broke into an Adobe network that handled credit card transactions for Adobe's customers and also accessed an Adobe source code repository.

48. Based upon the investigation of counsel and consultation with security experts, Plaintiffs believe that the hackers actually gained access to Adobe's servers sometime in mid-July 2013, and thereafter spent several weeks searching through Adobe's network without detection by Adobe or its security personnel. By mid-August 2013, the hackers reached Adobe's customer personal identifying information ("PII" or "Personal Information") databases and the source code repository, where they spent days or weeks removing customer PII and source code from Adobe's network—again, without detection by Adobe or its security personnel. As a result of the undetected breach of Adobe's systems and networks, the hackers were able to obtain the source code for Adobe's software products.

49. Adobe apparently did not discover that its customers' PII had been stolen or determine that its source code repository had been breached until sometime in September 2013, when two independent Internet security researchers informed Adobe of their discovery of a 40-gigabyte trove of

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:13-cv-05226-LHK

Adobe source code on a server used by cyber-criminals.  One such researcher, Hold Security LLC, stated, "While we are not aware of specific use of data from the [stolen] source code, we fear that disclosure of encryption algorithms, other security schemes, and software vulnerabilities can be used to bypass protections for individual and corporate data. Effectively, this breach may have opened a gateway for new generation of viruses, malware, and exploits."

50.     On October 3, 2013, more than two weeks after learning of the hack, Adobe announced the data breach and informed customers that hackers had accessed customer names, login IDs, passwords, credit and debit card numbers, mailing and billing addresses, and expiration dates, as well as other data for approximately 2.9 million customers worldwide.  Adobe also confirmed that, along with the PII lost during the breach, hackers had compromised the source code for Adobe Acrobat, ColdFusion, ColdFusion Builder and "other Adobe products."

51.     Adobe began informing some customers whose Personal Information had been stolen that their Adobe passwords were reset and that these customers had to select a new password.  However, Adobe downplayed any risk to its customers by stating that the credit card numbers were encrypted. Adobe's Chief Security Officer, Brad Arkin, stated that "[b]ased on our findings to date, [Adobe] is not aware of any specific increased risk to customers as a result of this incident."

52.     On October 29, 2013, more than a month after becoming aware of the theft, Adobe announced that the security breach was much larger than first reported.  According to Adobe, hackers had obtained access to Adobe IDs and passwords for approximately 38 million active users.  Other reports have estimated that the data breach impacted closer to 150 million Adobe users.  Adobe also admitted that the hackers gained access to invalid and inactive Adobe IDs, Adobe IDs with invalid encrypted passwords and test account data and that Adobe had not notified all of those customers affected.

53.     Adobe also disclosed on October 29, 2013, that in addition to the source code for Acrobat, ColdFusion, and ColdFusion Builder, the attackers also stole a portion of the source code for Photoshop. [2]

---

[2] Investigation and discovery should reveal the full scope of source code theft.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:13-cv-05226-LHK

54.     Throughout October 2013, Adobe sent emails to impacted users asking them to reset their login credentials for their Adobe accounts and advised users to monitor their accounts for fraud and identity theft and to regularly review their account statements and credit reports.

55.     Although Adobe claimed to have notified all customers whose information was stolen, several customers reported that although they were advised by other companies that their Personal Information was included in the Adobe breach, Adobe had not notified them. On November 26, 2013, Adobe admitted that "[e]mail notifications are taking longer than we anticipated." As of November 26, 2013, approximately three and a half months after the breach, it was reported that Adobe had notified only an estimated 2.9 million of the 38 million customers affected by the breach.

56.     In addition, while Adobe had publicly announced it would provide impacted users with credit monitoring, the email notification did not mention any offer of credit monitoring services, and it took Adobe several days or weeks after announcing the breach to mail letters containing the activation codes for Adobe's offer of free credit monitoring.

57.     Although Adobe had previously stated that customers were not at risk of having their credit card numbers used because they had been encrypted, in later notification letters Adobe admitted that "the third party used our systems to decrypt some card numbers."

### Adobe's Failure to Use Industry Best Practices

58.     The security measures Adobe had in place at the time of the 2013 breach did not meet accepted industry standards and did not use industry-leading security engineering processes.

59.     Following the announcement of the breach, researchers revealed, and Adobe later confirmed, that the millions of passwords stolen during the data breach had not been stored by Adobe according to industry best practices.

60.     As part of its business, Adobe collects and stores bank, credit card data, billing information and other financial data of consumers that use or subscribe to Adobe products and services. Payment Card Industry, or PCI, is often accepted as the industry baseline standard for eCommerce and Retail providers.  PCI sets forth basic security measures for entities that obtain and process consumer financial, credit card, and banking data.  These standards are designed to limit and prevent outside cyber-threats or security breaches, and serve as a baseline (but not a ceiling) for security protocols.  At a

minimum, companies like Adobe that do business with major financial institutions or credit card issuers must certify that their security measures and protocols are compliant with PCI standards.  Based upon the investigation of counsel in consultation with a security industry consultant, Plaintiffs believe and hereby allege that Adobe did not develop or maintain PCI-compliant security protocols; specifically, Adobe failed to: (a) build and maintain a secure network; (b) protect cardholder data; (c) implement strong access control measures; and (d) regularly monitor and test its networks.

61.     NIST (National Institutes of Standards and Technology) is the accepted standardization body for the U.S. Department of Commerce.  NIST issues industry guidelines regarding the acceptable security standards for those companies and entities that store consumers' PII and financial information.  These industry guidelines include, but are not limited to, Guidelines on Cloud Computing, Security and Privacy, Hashing for Document Security, Guidelines for System Security, and the Guide to Intrusion Detection and Prevention Systems (IDPS).  Adobe, as a software industry leader, is held to the NIST standards by the security industry community, Adobe's peers, and their customers.

62.     Adobe's security processes and protocols also failed to meet industry standards in several additional ways.  For example:

    a.  Adobe's network infrastructure failed to detect anomalies that would have been detected through appropriate IDPS and SIEM deployments.

    b.  Adobe failed to prevent access to software source code through adequate network level system controls.  Adobe allowed external users to breach multiple layers of security to gain access to source code maintained at the deepest levels of infrastructure.

    c.  Adobe failed to set up adequate process and protocols to deal with incidents and intrusions into the infrastructure.

    d.  Adobe failed to adequately secure the server from which the hackers gained entry.

    e.  Adobe failed to properly segment data and source code that permitted faster and easier access to hackers once they initially infiltrated Adobe's networks and servers.

    f.  Adobe failed to properly and timely implement "salting" within its cryptographic hash function, and thus allowed for reverse engineering of customers' passwords with

14

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:13-cv-05226-LHK

ease.  Adobe's implementation of symmetric encryption also failed to follow Adobe's own publicized security protocols as well as industry recognized standards. Properly implemented hashes would have secured each password individually and removed the ability for reverse engineering and analysis by cyber-criminals based upon frequent re-use of known ciphers.

63.    Adobe's encryption method was so weak that with very little effort researchers were able to recover a lot of information about the compromised data, including identifying the top five passwords precisely, the 2.75% of users who chose them, the compromised accounts' password hints, and the password length of nearly one-third of the nearly 150 million-user database.

64.    Additionally, the fact that Adobe itself did not recognize or understand *for several weeks* that Adobe source code, PII and Adobe customer data had been compromised and taken by hackers strongly suggests that Adobe failed to utilize industry-compliant security measures, systems or protocols.  Adequate system controls, user restriction, and behavioral analysis, such as that provided by a strong SIEM platform, would have given Adobe indication of the existence of a potential and reasonably foreseeable threat early on.

65.    In the wake of the massive breach, security experts opined that the breach was expected given Adobe's abysmal record when it came to security.  According to those experts, Adobe's software is a prime target for hackers because its core code is old and weak by today's standards.  Adobe's updates and security patches are built on top of that code but cannot make up for the software's inherent flaws.  According to one news article, Adobe's patches are "akin to making repairs to a house with a sinking foundation."

66.    Security experts further warned that the Adobe's security track record is only going to get worse.  According to Kevin Rogers, CEO of the security firm Cypherpath, Adobe's customers will remain at risk of attack until the company completely revamps its security practices.

### The Impact of Adobe's Poor Security Practices

67.    The impact of Adobe's substandard security practices is far-reaching.  The theft of Adobe users' logins, passwords, financial data and PII puts users at risk not only with respect to their continued use of Adobe products or services, but with respect to their use of third-party, non-Adobe applications as

well.  It is well known within the computer software industry that users often use the same access or user

credentials—i.e., the same passwords, hints and identifying information—with multiple software

applications and web sites requiring authentication.  Users that employ access or user credentials for

Adobe and non-Adobe products and services, therefore, are at continuing risk of harm to hacking or

cyber-theft.  For this reason, many online businesses that do not use Adobe products or services

nonetheless have elected to disable customer accounts they believe may be in any way affected by the

Adobe breach, and require users to manually change their passwords to reactivate.

68.     Adobe's lax security also has led to the theft of the source code for Adobe products.  The

exposure of this source code gives any researcher, malicious or not, the ability to immediately identify

flaws or vulnerabilities in the application.  When Adobe first announced the theft of the source code for

Adobe Acrobat, ColdFusion, ColdFusion Builder and "other Adobe products," many Adobe users

became concerned that the stolen source code made their Adobe software products more vulnerable to

attack.  At that time, however, Adobe would not give any more public information on the scope of the

breach.

69.     Source code is the instruction set in use to build an application.  Thus, much like

engineering blueprints for a building, the source code informs a hacker by revealing the ways in which

the structure of the application is most vulnerable to attack or exploit.  Once a hacker understands,

pinpoints, or creates a "vulnerability" or "exploit" in the software, the result can be sold on the black

market to the highest bidder.  Now, as a result of the September 2013 breach, Adobe's source code is

located in multiple public and private forums on the Internet.

70.     In the few months since the September 2013 breach, several entities have begun

advertising so-called "Zero Day" or unpatched exploits for Adobe software products, including those

products that were compromised in the September 2013 breach.  Anyone wishing to purchase these

exploits can use them to access data or information on a computer system with the installed Adobe

product(s).  With Adobe's source code now readily available, similar tools will continue to be developed

by the hacker community and used to access Adobe users' computers.  In the aftermath of the breach,

Adobe has issued several emergency software updates to fix critical security flaws in its software that

attackers are already exploiting.

71.    The theft of Adobe ColdFusion source code is of particular concern, since ColdFusion is a web application development platform used to collect and store personal information on websites around the world.  Several prominent companies have announced their websites have been already been breached through attacks that exploited ColdFusion's source code vulnerabilities, including J.M. Smucker Company, SecurePay, Elightbulbs.com, and LaCie.

72.    In short, Adobe's failure to maintain appropriate security measures for its systems and source code has left millions of users of Adobe products vulnerable in ways that cannot be remedied by programs that simply monitor customers' credit and bank accounts for fraudulent activity.  Among other things, Adobe's lax security measures and the disclosure of the source code for its products has allowed outsiders to analyze the code for code re-use and to identify new vulnerabilities in Adobe's software products.   This means that cyber-criminals have a ready blueprint to create future exploits and malware that can be introduced into Adobe users' programs and computers, often undetected.  Until such time as the code is rewritten and Adobe adopts appropriate, industry-compliant security measures, Adobe users will remain at risk.

73.    Some security experts have suggested that Adobe users switch to different software to protect themselves against a future hack.  Unfortunately, many Adobe users have invested substantial amounts of money in their Adobe software or committed to annual subscriptions for Adobe services under the mistaken belief and understanding that Adobe's software was secure and are now stuck with software products and services that are of less value to them.

## PLAINTIFFS' EXPERIENCES

### Plaintiff Duke's Experience

74.    On or about June 11, 2013, Mr. Duke purchased an annual subscription for Adobe ExportPDF through Adobe's website.  Mr. Duke was required to provide his credit card number and billing information and was charged approximately $20.00 for the subscription.

75.    To gain access to the ExportPDF, Mr. Duke provided Adobe with his name, home address, email address, and credit card information, including credit card number, expiration date and billing address.

76.     On or about October 14, 2013, Adobe notified Mr. Duke that his personal information was compromised as a result of the data breach.

**Plaintiff Kar's Experience**

77.     In or about April 2013, Mr. Kar purchased an Adobe Acrobat XI Pro software license for approximately $199 from Adobe using Adobe's website accessed via a computer located at his office in Los Angeles, California for his personal and business use.

78.     In order to purchase the Adobe Acrobat XI Pro software license online, Adobe required Mr. Kar to establish, maintain, and update his online account and provide his personal information to Adobe, which Adobe, in turn, stored and maintained on their servers and which remotely interfaced with Mr. Kar's computers following purchase.

79.     In deciding to purchase the Adobe Acrobat XI Pro software license online, Mr. Kar believed and understood that part of the premium purchase price he paid for the license would be used to provide "reasonable… security controls" to protect his personal information. Based upon Adobe's many representations regarding the company's industry-leading security practices, Mr. Kar believed that Adobe would use reasonable methods, on par with or greater than those accepted as the industry standard, to protect his personal information. Mr. Kar relied on these representations and assurances regarding the use of reasonable security controls to protect his personal information.  Had Mr. Kar known that Adobe's security practices were inferior to industry standard security practices, he would not have purchased the license online or stored his personal information with Adobe.

80.     On or about October 20, 2013, Mr. Kar received a letter from Adobe informing him that his PII had been compromised by a data breach. The letter stated that the hackers had gained access to customer names, payment card information, expiration dates, and other information relating to customer orders.  In addition to offering Mr. Kar enrollment in a one-year credit monitoring membership through Experian, Adobe suggested that Plaintiff monitor his account for potential fraud and identity theft, "including regularly reviewing your account statements and monitoring free credit reports."

81.     Plaintiff incurred and purchased monthly credit monitoring services for $19.95 per month on and after receipt of the October 20, 2013 letter.

**Plaintiff Halpain's Experience**

82.     Ms. Halpain is a graphic and website designer who uses Adobe design software as part of her business creating print graphics and websites for clients.  Since 2007, she has purchased several Adobe graphic and website design software products and services.

83.     In February 2013, Ms. Halpain purchased a year-long Creative Cloud subscription service for $29.00 per month with a one-year commitment.

84.     Prior to her purchase Ms. Halpain read and relied on Adobe's Privacy Policy and the representations contained therein before agreeing to purchase her Creative Cloud and other Adobe products.  Ms. Halpain believed that the service she was purchasing included secure access to Adobe's latest product updates and a secure place in "the cloud" to store her files.  Because Adobe required her to keep an active credit or debit card on file to maintain her Adobe Creative Cloud subscription, Ms. Halpain also believed that Adobe would use reasonable methods to secure her credit card information.  Had Ms. Halpain known that Adobe employed substandard security practices, she would not have subscribed to the Creative Cloud service.

85.     On October 3, 2013, Ms. Halpain received an email from Adobe notifying her of the data breach and advising her to reset her login information and to monitor her accounts and credit report.

86.     On October 22, 2013, Ms. Halpain received a letter from Adobe with an offer for a credit monitoring service.  Ms. Halpain believed that the credit monitoring service was insufficient to meet her needs and decided to buy an alternative credit monitoring service from myfico.com for approximately $15.00 dollars per month.  In addition to purchasing alternative crediting monitoring services Ms. Halpain decided to sign up for a password security service called LastPass which provides password protection beyond the protection Adobe uses.

87.     On February 15, 2014, Ms. Halpain was sent an alert from an identity-theft service called Lifelock, which she subscribes to for $25 per month.  Lifelock had detected some of her personal information on black market websites.  Ms. Halpain was traveling at the time, but when she returned to the United States, she called Lifelock who confirmed the validity of its alert and advised her to change her account passwords.  Had Ms. Halpain not subscribed to Lifelock, she would not have known that her personal information was available on black market websites.

88.     Ms. Halpain remains concerned that Adobe's software and networks remain vulnerable to attack given what she now knows about Adobe's substandard security practices.  She still had to keep an active credit or debit card on file with Adobe and pay $29.00 per month for her Creative Cloud subscription until her one-year commitment expired in 2014.  If Ms. Halpain cancelled her subscription before her one-year contract ended, she would have been subject to a monetary penalty.

89.     As a result of the breach, Ms. Halpain's Creative Cloud subscription is of significantly less value to her because she has built client websites on vulnerable software that are more vulnerable to attack.  Consequently, Ms. Halpain has had to notify her clients about potential vulnerabilities in the websites she creates and maintains with Adobe's software.  Ms. Halpain now has to monitor the security of the websites she maintains for her clients and is looking into alternative and more secure methods for continuing to support and maintain her clients' websites.  Ms. Halpain is also frustrated by Adobe's failure to provide her with critical information regarding the scope of the data breach.  Ms. Halpain has only been advised by Adobe to change her Adobe username and password, but does not know what further steps she should take to prevent further harm to her and/or her clients.  Additionally, Ms. Halpain has spent time and money as a result of the breach in order to protect her PII.

**Plaintiff McGlynn's Experience**

90.     In or about August 2013, Ms. McGlynn purchased a one-year subscription for Adobe Creative Cloud from her home in Oakland, California, using a European-issued credit card, for €35 EUR (approximately $48.00 USD)  per month with a one-year commitment.

91.     Ms. McGlynn read and reasonably relied on Adobe's representations, on its website in its End User Agreement and Privacy Policy, regarding both its use of safeguards to protect her PII from loss, misuse or unauthorized access, and its stated adherence to "latest best security practices" with respect to Adobe software products and services and user passcodes, login credentials, credit card and other personally private information.  Ms. McGlynn additionally believed that the Creative Cloud service she was purchasing included secure access to Adobe's latest product updates and a secure place in "the cloud" to store files.  Had Ms. McGlynn known that Adobe employed substandard security practices, she would not have subscribed to the Creative Cloud service.

92.     On October 3, 2013, Ms. McGlynn received an email from Adobe notifying her of the data breach and advising her to reset her login information and to monitor her accounts and credit report.

93.     Ms. McGlynn is concerned that Adobe's software and networks remain vulnerable to attack given what she now knows about Adobe's substandard security practices.  She must still keep an active credit or debit card on file with Adobe, however, and pay €35 Euro (approximately $48.00 USD) per month for her Creative Cloud subscription until her one-year commitment expires in 2014.  Ms. McGlynn contacted Adobe personnel following the September 2013 data breach, who confirmed that she would be subject to a monetary penalty if she decided to cancel her membership before her one-year contract ends.

**Plaintiff Page's Experience**

94.     Mr. Page is a photographer and owner of Marcel Page Photography.

95.     On or about March 26, 2013,  Mr. Page purchased an upgrade to Adobe Photoshop using a credit card that had been issued in the name of Marcel Page Photography, an unincorporated business entity he owns.  In 2007, Mr. Page purchased Adobe Lightroom and Adobe Photoshop.  On various dates in 2008, 2009, and 2010, Mr. Page had purchased additional versions or upgrades of Adobe Lightroom and Adobe Photoshop.

96.     As part of his purchases, Mr. Page provided Adobe with his name, email address, and account information, including account number, expiration date and billing address.

97.     On or about November 8, 2013, Mr. Page received a letter from Adobe informing him that his personal information was compromised as a result of the data breach. The letter stated that the attackers had gained access to customer names, payment card information, expiration dates, and other information relating to customer orders.  In addition to offering Mr. Page enrollment in a one-year credit monitoring membership through Experian, Adobe suggested that Plaintiff monitor his account for potential fraud and identity theft, "including regularly reviewing your account statements and monitoring free credit reports."

**Plaintiff McHenry's Experience**

98.     Plaintiff Jacob McHenry purchased Adobe Illustrator on or about April 30, 2013, for approximately $579.99.  As required as a part of his purchase, Mr. McHenry created an Adobe username and password.

99.     Mr. McHenry relied on Adobe's Privacy Policy and believed that Adobe would provide reasonable security to secure his personal information, including his username and password.

100.    Mr. McHenry received a letter from Adobe, dated October 16, 2013, indicating that due to a security breach of Adobe's networks, his personal information had been compromised.

## CLASS ACTION ALLEGATIONS

101.    Plaintiffs bring claims on behalf of several classes of similarly situated persons, which they initially propose be defined as follows:

### California Data Breach Class

All residents of California whose personal information was compromised as a result of the data breach announced by Adobe in October 2013.

### Contract Class

All persons residing or headquartered within the United States who are currently in a contractual relationship with Adobe governed by one of Adobe's End-User Licensing Agreement or General Terms of Use.

### Restitution Class

All persons residing or headquartered within the United States who purchased a ColdFusion product or Creative Cloud subscription within four years of the filing of this lawsuit.

102.    Excluded from all proposed classes are Adobe; any affiliate, parent, or subsidiary of Adobe; any entity in which Adobe has a controlling interest, any officer, director, or employee of Adobe; any successor or assign of Adobe; and any Judge to whom this case is assigned as well as his or her immediate family.

103.    Each of the proposed classes meet the criteria for certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure:

104.    <u>Numerosity</u>.  Members of each proposed class number in the millions, making joinder of each individual member impracticable.

105.   <u>Existence and Predominance of Common Questions</u>.  Common questions of law and fact exist for each of the proposed class's claims and predominate over questions affecting only individual class members.

For the California Data Breach Class, common questions include:

    a.   Whether Adobe violated California Civil Code § 1798.81.5 by failing to implement reasonable security procedures and practices;

    b.   Whether Adobe violated California Civil Code § 1798.82 by failing to promptly notify class members their personal information had been compromised;

    c.   Whether class members may obtain an injunctive relief against Adobe under Civil Code § 1798.84 or under the UCL; and

    d.   What security procedures and data-breach notification procedure should Adobe be required to implement as part of any injunctive relief ordered by the Court.

For the Contract Class, common questions include:

    a.   Whether Adobe has a contractual obligation under its End-User License Agreements (EULAs) or General Terms and Services to use reasonable security measures;

    b.   Whether Adobe has complied with any contractual obligation to use reasonable security measures; and

    c.   What security measures, if any, must be implemented by Adobe to comply with its contractual obligations.

For the Restitution Class, common questions include:

    a.   Whether security is a material consideration for a reasonable consumer deciding whether to subscribe to Adobe's Creative Cloud or purchase a ColdFusion product;

    b.   Whether Adobe's failure to disclose that it does not enlist industry standard security practices constitutes a fraudulent business practice that is likely to deceive a reasonable consumer of Adobe's Creative Cloud or ColdFusion products;

    c.   Whether Adobe's failure to disclose that it does not enlist industry standard security practices constitutes an unfair business practice; and

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:13-cv-05226-LHK

d.  Whether and in what amount should the Court order restitution to Adobe customers who subscribed to Adobe's Creative Cloud or a ColdFusion product.

106.  <u>Typicality</u>.  Plaintiffs' claims are typical of the claims of the proposed classes because, among other things, Plaintiffs and class members sustained similar injuries as a result of Adobe's uniform wrongful conduct and their legal claims all arise from the same core Adobe practice.

107.  <u>Adequacy of Representation</u>.  Plaintiffs are adequate representatives of the proposed classes because their interests do not conflict with the interests of the members of the classes they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation and intend to prosecute this action vigorously.

108.  <u>Superiority</u>.  The class action is superior to other available means for the fair and efficient adjudication of this dispute.  The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Adobe economically feasible.  Even if it were feasible, individualized litigation presents a potential for inconsistent judgments and increases the burden on all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

109.  The proposed classes may also be certified under Rule 23(b)(1) or (b)(2) because:

a.  the prosecution of separate actions by the individual members of the proposed classes would create a risk of inconsistent or varying adjudication which would establish incompatible standards of conduct for Adobe;

b.  the prosecution of separate actions by individual class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c.  Adobe has acted or refused to act on grounds that apply generally to the proposed classes, thereby making appropriate final injunctive relief or declaratory relief described herein appropriate with respect to the proposed classes as a whole.

## FIRST CAUSE OF ACTION

**For Violation of the Civil Code Sections 1798.81.5, 1798.82,
and the UCL's Unlawful Prong On Behalf of the California Data Breach Class**

110.    Plaintiffs Duke, Kar, Halpain and McGlynn reallege, as if fully set forth, each and every allegation herein.

111.    "[T]o ensure that personal information about California residents is protected," the California legislature enacted Civil Code section 1798.81.5, which requires that any business that "owns or licenses personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

112.    By failing to implement reasonable measures to protect the California Data Breach Class's personal data, Adobe violated Civil Code section 1798.81.5.

113.    In addition, by failing to promptly notify all affected Adobe users that their personal information had been acquired (or was reasonably believed to have been acquired) by unauthorized persons in the data breach, Adobe violated Civil Code section 1798.82 of the same title.

114.    By violating Civil Code sections 1798.81.5 and 1798.82, Adobe "may be enjoined" under Civil Code section 1798.84(e).

115.    In addition, Adobe's violations of Civil Code section 1798.81.5 and 1798.82 constitute an unlawful acts or practices under California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 et seq., which affords the Court discretion to enter whatever orders may be necessary to prevent future unlawful acts or practices.

116.    Plaintiffs accordingly request that the Court enter an injunction requiring Adobe to implement and maintain reasonable security procedures, including, but not limited to: (1) ordering that Adobe utilize strong industry standard encryption algorithms for encryption keys that provide access to stored customer data; (2) ordering that Adobe implement the use of its encryption keys in accordance with industry standards; (3) ordering that Adobe, consistent with industry standard practices, engage third party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests and audits on Adobe's systems on a periodic basis; (4) ordering that Adobe engage third party security auditors and internal personnel, consistent with industry

25

standard practices, to run automated security monitoring; (5) ordering that Adobe audit, test and train its security personnel regarding any new or modified procedures; (6) ordering that Adobe, consistent with industry standard practices, segment consumer data by, among other things, creating firewalls and access controls so that if one area of Adobe is compromised, hackers cannot gain access to other portions of Adobe's systems; (7) ordering that Adobe purge, delete, destroy in a reasonable secure manner customer data not necessary for its provisions of services; (8); ordering that Adobe, consistent with industry standard practices, conduct regular database scanning and security checks; (9) ordering that Adobe, consistent with industry standard practices, evaluate web applications for vulnerabilities to prevent web application threats to consumers who purchase Adobe products and services through the internet; (10) ordering that Adobe, consistent with industry standard practices, periodically conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and (11) ordering Adobe to meaningfully educate its customers about the threats they face as a result of the loss of their PII to third parties and the theft of Adobe's source code, as well as the steps Adobe's customers must take to protect themselves.

117.    Plaintiffs further request that the Court requires Adobe to identify and notify all members of the California Data Breach class who have not yet been informed of the data breach, and to notify affected customers of any future data breaches by email within 24 hours of Adobe's discovery of a breach or possible breach and by mail within 72 hours.

## SECOND CAUSE OF ACTION

### For Declaratory Relief on Behalf of the Contract Class

118.    Plaintiffs Duke, Kar, Halpain, McGlynn, Page, and McHenry reallege, as if fully set forth, each and every allegation herein.

119.    As previously alleged, Plaintiffs and the Contract Class entered into contracts with Adobe that incorporated Adobe's Privacy Policy and provides that Adobe can access their computers, software, and data in accordance with that Privacy Policy.

120.    Adobe's Privacy Policy provides that it will use "reasonable administrative, technical, and physical security controls" to protect customers' information.  Adobe's Safe Harbor Privacy Policy, which supplements Adobe's Privacy Policy, further provides that "Adobe Systems Incorporated uses

reasonable physical, electronic, and administrative safeguards to protect your personal information from loss; misuse; or unauthorized access, disclosure, alteration, or destruction."

121.    Adobe has failed to live up to its contractual obligations to provide reasonable security measures, as indicated by its history of security breaches and the specific data breach that precipitated this lawsuit.

122.    In addition, the theft of software code has rendered Adobe's software even more vulnerable to unauthorized access, has already led to further data breaches, and requires that Adobe take even more stringent measures to safeguard its customers' information and remedy its prior security lapses.

123.    An actual controversy has arisen in the wake of Adobe's latest security breach regarding its contractual obligations to provide reasonable security measures to the Contract Class.  Adobe maintains that its security measures were adequate and remain adequate.  Adobe further denies that it previously had or now has any obligation to better safeguard its customers' data and personal information.

124.    Plaintiffs and the Contract Class seek a declaration (a) that Adobe's existing security measures do not comply with its contractual obligations to reasonably protect its customers' data, and (b) that to comply with its contractual obligations, Adobe must implement and maintain reasonable security measures, including, but not limited to: (1) ordering that Adobe utilize strong industry standard encryption algorithms for encryption keys that provide access to stored customer data; (2) ordering that Adobe implement the use of its encryption keys in accordance with industry standards; (3) ordering that Adobe, consistent with industry standard practices, engage third party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests and audits on Adobe's systems on a periodic basis; (4) ordering that Adobe engage third party security auditors and  internal personnel, consistent with industry standard practices, to run automated security monitoring; (5) ordering that Adobe audit, test and train its security personnel regarding any new or modified procedures; (6) ordering that Adobe, consistent with industry standard practices, segment consumer data by, among other things, creating firewalls and access controls so that if one area of Adobe is compromised, hackers cannot gain access to other portions of Adobe's systems; (7) ordering

that Adobe purge, delete, destroy in a reasonable secure manner customer data not necessary for its provisions of services; (8); ordering that Adobe, consistent with industry standard practices, conduct regular database scanning and security checks; (9) ordering that Adobe, consistent with industry standard practices, evaluate web applications for vulnerabilities to prevent web application threats to consumers who purchase Adobe products and services through the internet; (10) ordering that Adobe, consistent with industry standard practices, periodically conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and (11) ordering Adobe to meaningfully educate its customers about the threats they face as a result of the loss of their PII to third parties and the theft of Adobe's source code, as well as the steps Adobe's customers must take to protect themselves.

## THIRD CAUSE OF ACTION

### For Violation of the UCL on Behalf of the Contract Class

125.     Plaintiffs Duke, Kar, Halpain, McGlynn, Page, and McHenry reallege, as if fully set forth, each and every allegation herein.

126.     Adobe engaged in unfair and unlawful business practices in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. ("UCL").

127.     Plaintiffs suffered injury in fact and lost money or property as a result of Adobe's alleged violations of the UCL.

128.     The acts, omissions and conduct of Adobe as alleged constitutes a "business practice" within the meaning of the UCL.

129.     Adobe violated the unfair and unlawful prongs of the UCL by failing to honor the terms of its contracts that incorporated Adobe's Privacy Policy and provide that Adobe can access the members of the Contract Class' computers, software, and data in accordance with that Privacy Policy, as alleged above.

130.     The acts, omissions and conduct of Adobe constitutes a violation of the unlawful prong of the UCL because it resulted in a systematic breach of the contracts, failed to comport with a reasonable standard of care and California public policy—as reflected in statutes like the Online Privacy Protection Act, Cal. Bus. & Prof. Code § 22576; the Information Practices Act, Cal. Civ. Code § 1798 et

seq., and California Civil Code sections 1798.81.5 and 1798.82 concerning customer records—which seek to protect customer data and ensure that entities who solicit or are entrusted with personal data utilize reasonable security measures.

131.    Adobe's acts, omissions and conduct also constitute "unfair" business acts or practices because such acts, omissions and conduct offended public policy and constitutes immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiffs and the other members of the Contract Class. The gravity of Adobe's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Adobe's legitimate business interests, other than Adobe's conduct described herein.  Adobe's conduct also undermines California public policy—as reflected in statutes like the Online Privacy Protection Act, Cal. Bus. & Prof. Code § 22576; the Information Practices Act, Cal. Civ. Code § 1798 et seq., and California Civil Code sections 1798.81.5 and 1798.82 concerning customer records—which seek to protect customer data and ensure that entities who solicit or are entrusted with personal data utilize reasonable security measures.  The conduct also undermines California's public policy concerning preservation of contracts and contractual rights and obligations.

132.    As a result of Adobe's violations, Plaintiffs and the other members of the Contract Class are entitled to injunctive relief including, but not limited to: (1) ordering that Adobe utilize strong industry standard encryption algorithms for encryption keys that provide access to stored customer data; (2) ordering that Adobe implement the use of its encryption keys in accordance with industry standards; (3) ordering that Adobe, consistent with industry standard practices, engage third party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests and audits on Adobe's systems on a periodic basis; (4) ordering that Adobe engage third party security auditors and  internal personnel, consistent with industry standard practices, to run automated security monitoring; (5) ordering that Adobe audit, test and train its security personnel regarding any new or modified procedures; (6) ordering that Adobe, consistent with industry standard practices, segment consumer data by, among other things, creating firewalls and access controls so that if one area of Adobe is compromised, hackers cannot gain access to other portions of Adobe's systems; (7) ordering that Adobe purge, delete, destroy in a reasonable secure manner customer data not

29

necessary for its provisions of services; (8); ordering that Adobe, consistent with industry standard practices, conduct regular database scanning and security checks; (9) ordering that Adobe, consistent with industry standard practices, evaluate web applications for vulnerabilities to prevent web application threats to consumers who purchase Adobe products and services through the internet; (10) ordering that Adobe, consistent with industry standard practices, periodically conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and (11) ordering Adobe to meaningfully educate its customers about the threats they face as a result of the loss of their PII to third parties and the theft of Adobe's source code, as well as the steps Adobe's customers must take to protect themselves.

## FOURTH CAUSE OF ACTION

### For Violation of the UCL on Behalf of the Restitution Class

133.   Plaintiffs Halpain and McGlynn reallege, as if fully set forth, each and every allegation herein.

134.   Adobe acts and practices, as alleged in this complaint, constitute unfair and fraudulent business practices, in violation of the UCL.

135.   By failing to disclose that it does not enlist industry standard security practices, which render Adobe's products and services particularly vulnerable to data breaches, Adobe engaged in a fraudulent business practice that is likely to deceive a reasonable consumer.

136.   Adobe's security is important to all its users, but particularly to those who purchased Adobe's ColdFusion products, which are used to design secure website applications, or Adobe's Creative Cloud service, which offers frequent updates to Adobe products and a place to store and share files through "the cloud." These customers are particularly sensitive to security, as would be expected of someone designing a website application that collects data from others or deciding whether to open their computer up to the cloud to get more frequent program updates and more conveniently store and share their data (and provide an updated credit or debit card for monthly billing). Adobe recognizes that security is a common concern of prospective Creative Cloud purchasers deciding whether to switch to a cloud-based subscription service, including an entire security section in its "Frequently Asked Questions" about the Creative Cloud.

137.    A reasonable consumer would not have purchased a ColdFusion product or subscribed to the Creative Cloud service had they known the truth about Adobe's security procedures.  By withholding material information about Adobe's security practices, Adobe was able to convince customers to invest significant money and time into ColdFusion and CreativeCloud.  These customers not only gave money to Adobe, they are now in the position of having to continue giving money to Adobe for under-secured services or lose what they've already invested.  ColdFusion customers would need to purchase another (very expensive) web development platform and re-develop their websites, while Creative Cloud customers would lose access to their creative tools and have to convert from subscription-based service to licensed-based products.

138.    Adobe's failure to disclose that it does not enlist industry standard security practices also constitutes an unfair business practice under the UCL.  Adobe's conduct is unethical, unscrupulous, and substantially injurious to the Restitution Class.  Whereas Adobe's competitors have spent the time and money necessary to appropriately safeguard their products, service, and customer information, Adobe has not—to the detriment of its customers and to competition.  Adobe's conduct also undermines California public policy—as reflected in statutes like the Online Privacy Protection Act, Cal. Bus. & Prof. Code § 22576; the Information Practices Act, Cal. Civ. Code § 1798 et seq., and California Civil Code sections 1798.81.5 and 1798.82 concerning customer records—which seek to protect customer data and ensure that entities who solicit or are entrusted with personal data utilize reasonable security measures.

139.    As a result of Adobe's fraudulent and unfair practices, Plaintiffs and the Restitution Class have suffered injury in fact and lost money or property.  They purchased ColdFusion products or Creative Cloud service they otherwise would not have purchased and paid more for them than Adobe could have otherwise commanded in the marketplace.

140.    Plaintiffs request that the Court issue sufficient equitable relief to restore class members to the position they would have been in had Adobe not engaged in unfair competition, including by ordering restitution of all funds that Adobe may have acquired as a result of its unfair competition.  Such an award could include return of Creative Cloud subscription fees to those customers who would now

1  rather switch to a license-based products or a return of the ColdFusion purchase price for customers who

2  would now rather switch to another web application platform.

3  ## PRAYER FOR RELIEF

4  WHEREFORE, Plaintiffs pray for judgment as follows:

5      a.    For an order certifying the proposed classes and appointing Plaintiffs and their counsel to

6             represent the classes;

7      b.    On behalf of the California Data Breach Class, for an injunction requiring Adobe to

8             implement and maintain reasonable security procedures, including the measures specified

9             above, and promptly notify all affected customers of future data breaches;

10      c.    On behalf of the Contract Class, for a declaration that that Adobe's existing security

11             measures do not comply with its contractual obligations to reasonably protect its

12             customers' data, and that to comply with its contractual obligations, Adobe must

13             implement and maintain reasonable security measures, including the measures specified

14             above;

15      d.    On behalf of the Contract Class, injunctive relief requiring Adobe to implement and

16             maintain reasonable security procedures, including the measures specified above;

17      e.    On behalf of the Restitution Class, for an order requiring Adobe to issue restitution

18             sufficient to restore class members to the position they would have been in had Adobe

19             disclosed that it does not use industry standard security practices, including pre- and post-

20             judgment interest;

21      f.    For any order awarding Plaintiffs and the members of the classes reasonable attorneys'

22             fees and costs of suit, including expert witness fees; and

23      g.    For an order awarding such other and further relief as this Court may deem just and

24             proper.

25  ## DEMAND FOR JURY TRIAL

26  Plaintiffs hereby demand a jury trial on all claims so triable.

27

28

1  Dated: April 4, 2014                    Respectfully Submitted

2                                          **GIRARD GIBBS LLP**

3

4                                          By:   _/s/ Eric H. Gibbs_____

5

6                                          Eric H. Gibbs
                                           Matthew B. George
7                                          Caitlyn D. Finley
                                           601 California Street, 14th Floor
8                                          San Francisco, California 94108
                                           Telephone:  (415) 981-4800
9                                          Facsimile:  (415) 981-4846

10
                                           *Interim Class Counsel*
11
                                           Elizabeth C. Pritzker
12                                         ecp@pritzker-law.com
13                                         **PRITZKER LAW**
                                           633 Battery Street, Suite 110
14                                         San Francisco, California 94111
                                           Telephone: (415) 692-0772
15                                         Facsimile: (415) 366-6110

16
                                           Shehnaz M. Bhujwala
17                                         sbhujwala@kbsslaw.com
18                                         **KHORRAMI BOUCHER SUMNER
                                           SANGUINETTI, LLP**
19                                         444 S. Flower Street, 33rd Floor
                                           Los Angeles, California 90071
20                                         Telephone: (213) 596-6000
                                           Facsimile: (213) 596-6010
21

22                                         Todd M. Friedman
                                           tfriedman@attorneysforconsumers.com
23                                         Nicholas J. Bontrager
                                           nbontrager@attorneysforconsumers.com
24                                         **LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
25                                         369 S. Doheny Drive, Suite 415
                                           Beverly Hills, California 90211
26                                         Telephone: (877) 206-4741
                                           Facsimile: (866) 633-0228
27

28

---

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:13-cv-05226-LHK

Brian J. Robbins
brobbins@robbinsarroyo.com
Gregory E. Del Gaizo
gdelgaizo@robbinsarroyo.com
**ROBBINS ARROYO LLP**
600 B Street, Suite 1900
San Diego, California 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Timothy G. Blood
tblood@bholaw.com
Thomas J. O'Reardon, II
toreardon@bholaw.com
Paula M. Roach
proach@bholaw.com
**BLOOD HURST & O'REARDON LLP**
701 B Street, Suite 1700
San Diego, California 92101
Telephone: (619) 338-1100
Facsimile: (619) 338-1101

Gary E. Mason
gmason@wbmllp.com
**WHITFIELD BRYSON & MASON LLP**
1625 Massachusetts Avenue, NW, Suite 605
Washington, D.C. 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294

Adam J. Levitt
alevitt@gelaw.com
Edmund S. Aronowitz
earonowitz@gelaw.com
**GRANT & EISENHOFER P.A.**
30 North LaSalle Street, Suite 1200
Chicago, Illinois 60602
Telephone: (312) 214-0000
Facsimile: (312) 214-0001

*Plaintiffs' Executive Committee*

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:13-cv-05226-LHK